**Mustafa FTEJA, Plaintiff,**

v.

**FACEBOOK, INC., Defendant.**

**No. 11 Civ. 918 (RJH).**

United States District Court, S.D. New York.

Jan. 24, 2012.

Justin Nolan Kinney, Coughlin Duffy LLP, New York, NY, for Plaintiff.

RICHARD J. HOLWELL, District Judge:

Plaintiff Mustafa Fteja alleges that defendant Facebook, Inc. ("Facebook"), the social networking website, disabled his Facebook account without justification and for discriminatory reasons. Non-party Dimitrios Fatouros has moved to join the action. Facebook opposes that motion and has moved to transfer this action pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Northern District of California. In the alternative, Facebook moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the action for failure to state a claim for which relief can be granted or, in the alternative, for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e). For the following reasons, Facebook's motion to transfer is granted and this case is transferred to the Northern District of California.

## BACKGROUND

The following facts are taken from Fteja's complaint and from his opposition to Facebook's motion.

Fteja, a resident of Staten Island, New York, "was an active user of facebook.com." (Compl. ¶¶ 1–3.) Fteja "ha[d] been adhering to [F]acebook['s] terms of service" and "help[ing] build the [F]acebook community by adding content and signing up new members...." (*Id.* ¶ 8, 10.) But on September 24, 2010, Facebook allegedly disabled Fteja's account on September 24, 2010 "without warning" and "without reason." (*Id.* ¶ 4.)

As might be expected, given that "Facebook has become a very important means of communication," being denied access to the world's largest social networking site caused Fteja "harm in all his personal relationships and the ability to communicate...." (*Id.* ¶ 13.) Specifically, Fteja claims that the disabling of his account "hurt [his] feelings, emotionally distressed [him]" and "assaulted [his] good reputation among [his] friends and family...." (Pl.'s Opp'n ¶ 3.)

Fteja "has numerous times tried all channels to resolve this matter by procedures outlined on" the Facebook "website." (Compl. ¶ 5.) However, Fteja alleges that these attempts "have been ignored" and that Facebook still "has not given any reason for the account being disabled." (*Id.* ¶¶ 6, 7.) Fteja therefore surmises that Facebook "discriminated" against him "based on [his] religion and ethnicity," specifically that he is a Muslim and his name is Mustafa. (*Id.* ¶ 14; Pl.'s Opp'n ¶ 3.)

On January 25, 2011, Fteja filed this action in New York Supreme Court in New York County. On February 9, 2011, Facebook removed the action to this Court pursuant to 28 U.S.C. § 1441(a) on the basis of diversity of citizenship: Fteja is a

citizen of New York and Facebook is a Delaware corporation with its principle place of business in Palo Alto, California.

On April 4, 2011, Facebook moved [4] to transfer this action pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Northern District of California. In the alternative, Facebook moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the action for failure to state a claim for which relief can be granted or, in the alternative, for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e).

On April 18, 2011, Fatouros, whom Fteja "did not know," moved [12] pursuant to Federal Rule of Civil Procedure 20(a) to be joined as a plaintiff. Fatouros claims that Facebook disabled his account around the same time as it disabled Fteja's because Fatouros had posted on his "wall" an editorial he had written for a Cypriot newspaper regarding politics in Northern Cyprus.[1] (Fatouros Compl. ¶ 4.) Fteja consents to joining Fatouros but Facebook opposes the motion.

## LEGAL STANDARD

"[F]ederal law, specifically 28 U.S.C. § 1404(a), governs the District Court's decision whether to give effect to the parties' forum-selection clause and transfer this case...." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 32, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988). "A plaintiff's choice of forum 'is entitled to significant consideration and will not be disturbed unless other factors weigh strongly in favor of transfer.'" *Hershman v. UnumProvident Corp.*, 658 F.Supp.2d 598, 601 (S.D.N.Y. 2009) (quoting *Royal & Sunalliance v. British Airways*, 167 F.Supp.2d 573, 576

(S.D.N.Y.2001)). "The burden is on the moving party, here defendant[ ], to make a clear and convincing showing that transfer is proper." *Hershman*, 658 F.Supp.2d at 600.

"The threshold question in deciding transfer of venue ... is whether the action could have been brought in the transferee forum." *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F.Supp.2d 690, 695 (S.D.N.Y.2009). If the answer is yes, under 28 U.S.C. § 1404(a) "[a] district court may exercise its discretion to transfer venue 'for the convenience of parties and witnesses, in the interest of justice.'" *N.Y. Marine and Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir.2010) (quoting 28 U.S.C. § 1404(a)). "A motion to transfer under § 1404(a) thus calls on the district court to weigh in the balance a number of case-specific factors." *Stewart Org., Inc.*, 487 U.S. at 29, 108 S.Ct. 2239.

"Among the factors to be considered in determining whether to grant a motion to transfer venue are, *inter alia*: (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties." *N.Y. Marine and Gen. Ins. Co.*, 599 F.3d at 112. The convenience of the forum for witnesses "is probably considered the single most important factor in the analysis of whether a transfer should be granted." *Hershman*, 658 F.Supp.2d at 602 (quoting *Schnabel v. Ramsey Quantitative Sys., Inc.*, 322 F.Supp.2d 505, 516 (S.D.N.Y.

---

**1.** A Facebook "wall" is "a space on each user's profile page that allows friends to post messages for the user to see. These messages ... can be viewed by anyone with access to the user's profile page ..." *Crispin v. Christian Audigier, Inc.*, 717 F.Supp.2d 965, 977 (C.D.Cal.2010) (quotation marks omitted).

2004)). In addition, because a court's discretion to transfer an action "must be exercised at the very outset of the case, when relatively little is known about how the case will develop, courts have typically accorded substantial weight to the ... plaintiff's choice of forum." *Atl. Recording Corp.*, 603 F.Supp.2d at 695.

■■■ "The presence of a forum-selection clause ... will [also] be a significant factor that figures centrally in the district court's calculus." *Stewart Org., Inc.*, 487 U.S. at 29, 108 S.Ct. 2239. And "[t]he general rule is that forum selection clauses are regularly enforced." *Elite Parfums, Ltd. v. Rivera*, 872 F.Supp. 1269, 1271 (S.D.N.Y.1995). Indeed, "contractual forum-selection clauses will be enforced unless it can clearly be shown that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Bense v. Interstate Battery Sys. of Am., Inc.*, 683 F.2d 718, 721–22 (2d Cir.1982).

■■■ In this Circuit, whether to enforce "a forum selection clause involves a four-part analysis." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir.2007). "The first inquiry is whether the clause was reasonably communicated to the party resisting enforcement." *Id.* "The second step requires [the court] to classify the clause as mandatory or permissive, i.e., to decide whether the parties are required to bring any dispute to the designated forum or simply permitted to do so." *Id.* "Part three asks whether the claims and parties involved in the suit are subject to the forum selection clause." *Id.* "If the forum clause was communicated to the resisting party, has mandatory force and covers the claims and parties involved in the dispute, it is presumptively enforceable." *Id.*

■■■ "[O]nce a mandatory choice of forum clause is deemed valid, the burden shifts to the plaintiff to demonstrate exceptional facts explaining why he should be relieved from his contractual duty." *Weiss v. Columbia Pictures Television, Inc.*, 801 F.Supp. 1276, 1278 (S.D.N.Y.1992). Hence "[t]he fourth, and final, step is to ascertain whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Phillips*, 494 F.3d at 383 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)). That is a question of federal law. *See Phillips*, 494 F.3d at 384 ("Despite the presumptive validity of choice of law clauses, our precedent indicates that federal law should be used to determine whether an otherwise mandatory and applicable forum clause is enforceable under ... step four in our analysis.").

## DISCUSSION

The Court first considers "whether the action could have been brought in the transferee forum," here the Northern District of California. *Atl. Recording Corp.*, 603 F.Supp.2d at 695. That requires the Court to determine whether the Northern District of California would be a proper venue for this action and whether it would have jurisdiction over this action and over Facebook. *See Unlimited Care, Inc. v. Visiting Nurse Ass'n of E. Mass., Inc.*, 42 F.Supp.2d 327, 333 (S.D.N.Y.1999) ("A court electing to transfer an action, may only transfer such action 'to a district where it might have been brought initially,' (i.e., a district where defendant is subject to personal jurisdiction and venue would be proper)." (quoting *Volkswagen De Mexico, S.A. v. Germanischer Lloyd*, 768 F.Supp. 1023, 1028 (S.D.N.Y.1991)).

■ The Northern District of California would be a proper venue for this action. Venue is proper, *inter alia*, in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred...." 28 U.S.C. § 1391(a)(2). The Northern District of California would be such a district in this action because the nub of Fteja's claim is that Facebook wrongfully disabled his account and the employees responsible for disabling accounts work at Facebook's headquarters in Palo Alto, California which is in the Northern District of California.

The Northern District of California would have subject matter jurisdiction over this action on the basis of the parties' diversity of citizenship. And that court would have personal jurisdiction over Facebook because the presence of Facebook's headquarters in Palo Alto suggests that Facebook has had "continuous and systematic general business contacts" with California. *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568 (2d Cir.1996). *See also Tuttle v. Sky Bell Asset Mgmt., LLC*, No. C 10–03588, 2011 WL 1362124, at *6 (N.D.Cal. Apr. 11, 2011) ("Given that plaintiffs submit seemingly reliable documents to support their contention that Sky Bell's principal place of business is in California ... plaintiffs have made a sufficient *prima facie* showing of general jurisdiction over defendant Sky Bell.").

The next question, then, is whether Facebook has made a "clear and convincing showing that transfer is proper," *Hershman*, 658 F.Supp.2d at 600, that is, that transfer will advance "the convenience of parties and witnesses" as well as "the interest of justice.'" *N.Y. Marine and Gen. Ins. Co.*, 599 F.3d at 112.

On that score, the parties devote substantial attention to the forum selection clause contained in the terms and conditions that govern Facebook users' ac-

counts, known as the Terms of Use at the time that Fteja signed up for an account. (Dec. of A. Yang ("Yang Dec."), Mar. 31, 2011, ¶ 6 & Ex. A.) That clause provides as follows:

> You will resolve any claim, cause of action or dispute ("claim") you have with us arising out of or relating to this Statement or Facebook exclusively in a state or federal court located in Santa Clara County. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions. You agree to submit to the personal jurisdiction of the courts located in Santa Clara County, California for the purpose of litigating all such claims.

(Yang Dec. Ex. B ¶ 15(1).)

As an initial matter, Fteja argues that "[t]here is no proof that [he] agreed to a forum selection clause" and that he does "not remember agreeing to [the] forum selection clause or agreeing to any Facebook agreement." (Pl.'s Opp'n ¶ 1.) Impossible, says Facebook: "a putative Facebook user cannot become an actual Facebook user unless and until they have clicked through the registration page where they acknowledge they have read and agreed to Facebook's terms of use...." (Dec. of D. Willner, May 17, 2011, ¶ 2.)

As a matter of logic, Facebook appears to be correct. Declarations filed by Facebook employees, screenshots submitted by Fatouros, and Facebook's current website of which the Court takes judicial notice suggest that the Facebook sign-up process works as follows. A putative user is asked to fill out several fields containing personal and contact information. *See* http://www.facebook.com. The putative user is then asked to click a button that reads "Sign Up." After clicking this initial "Sign Up"

button, the user proceeds to a page entitled "Security Check" that requires a user to reenter a series of letters and numbers displayed on the page. Below the box where the putative user enters that letter-number combination, the page displays a second "Sign Up" button similar to the button the putative user clicked on the initial page. The following sentence appears immediately below that button: "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service." The phrase "Terms of Service" is underlined, an indication that the phrase is a hyperlink, a phrase that is "usually highlighted or underlined" and "sends users who click on it directly to a new location—usually an internet address or a program of some sort." *United States v. Hair*, 178 Fed.Appx. 879, 882 n. 3 (11th Cir.2006).

In order to have obtained a Facebook account, Fteja must have clicked the second "Sign Up" button. Accordingly, if the phrase that appears below that button is given effect, when Fteja clicked "Sign Up," he "indicat[ed] that [he] ha[d] read and agree[d] to the Terms of Policy."

However, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir.2004). And one such principle is that "[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir.2002). Hence the threshold requirement that the forum selection "clause was reasonably communicated to the party resisting enforcement." *Phillips*, 494 F.3d at 383.

In that regard, the Second Circuit has held that "a consumer's clicking on a . . . button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the . . . button would signify assent to those terms." *Specht*, 306 F.3d at 29–30. In *Specht*, the Second Circuit declined to enforce an arbitration clause to which a user purportedly agreed when he clicked on a button to download software. The terms and conditions were not visible anywhere on the screen containing the download button. Rather, "[t]he sole reference to" the terms and conditions "was located in text that would have become visible to plaintiffs only if they had scrolled down to the next screen where there was the following sentence: 'Please review and agree to the terms of the *Netscape SmartDownload software licensing agreement* before downloading and using the software.'" *Id.* (emphasis in original). The just italicized language appeared underlined and if a user "clicked on the underlined invitation to review and agree to the terms, a hypertext link would have taken the user to a separate webpage entitled 'License & Support Agreements.'" *Id.* at 23–24. That page included the arbitration clause. *See id.* at 24. "[I]n circumstances such as these, where consumers are urged to download free software at the immediate click of a button," the Court of Appeals held that "a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms." *Id.* at 32.

*Specht* does not squarely control this case because the second Sign–Up page's reference to the Terms of Use appeared immediately below the "Sign–Up" button. Yet this case does have something in common with *Specht* the fact that the terms and conditions were not displayed on the page where the user purportedly assented to the terms. Instead, those terms were visible only by clicking on a hyperlink. The Terms of Use therefore appear to be a

kind of so-called "browsewrap" agreement, "where website terms and conditions of use are posted on the website typically as a hyperlink at the bottom of the screen." *Hines v. Overstock.com, Inc.,* 668 F.Supp.2d 362, 366 (E.D.N.Y.2009). *Cf. Pollstar v. Gigmania Ltd.,* 170 F.Supp.2d 974, 981 (E.D.Cal.2000) ("[A] browse wrap license is part of the web site and the user assents to the contract when the user visits the web site.").

Several courts have enforced browsewrap agreements. *See, e.g., Ticketmaster L.L.C. v. RMG Technologies, Inc.,* 507 F.Supp.2d 1096, 1107 (C.D.Cal.2007) (plaintiff was "highly likely to succeed in showing that Defendant received notice of the Terms of Use and assented to them by actually using the website" where site displayed a warning that "Use of this website is subject to express *Terms of Use* " and "[t]he underlined phrase 'Terms of Use' is a hyperlink to the full Terms of Use"); *Sw. Airlines Co. v. BoardFirst, L.L.C.,* No. 3:06–CV–0891–B, 2007 WL 4823761, at *4 (N.D.Tex. Sept. 12, 2007); *Cairo, Inc. v. Crossmedia Servs., Inc.,* No. C 04–04825, 2005 WL 766610, at *5 (N.D.Cal. Apr. 1, 2005); *Ticketmaster Corp. v. Tickets.com, Inc.,* No. CV 997654, 2003 WL 21406289, at *2 (C.D.Cal. Mar. 7, 2003). *Cf. Pollstar v. Gigmania, Ltd.,* 170 F.Supp.2d 974, 982 (E.D.Cal.2000) (noting that "the browser wrap license agreement may be arguably valid and enforceable.").

However, several of these cases appear to have turned on the user's constructive knowledge of the hyperlinked terms. *See Sw. Airlines Co.,* 2007 WL 4823761, at *4; *Cairo, Inc.,* 2005 WL 766610, at *5. Indeed, "[m]ost courts which have considered the issue ... have held that in order to state a plausible claim for relief based upon a browsewrap agreement, the website user must have had actual or constructive knowledge of the site's terms and conditions, and have manifested assent to them." *Cvent, Inc. v. Eventbrite, Inc.,* 739 F.Supp.2d 927, 937–38 (E.D.Va.2010). And at least one court has declined to enforce terms and conditions that "only appear[ed] on [a] website via a link buried at the bottom of the first page" where users "are not required to click on that link, nor are they required to read or assent to the Terms of Use in order to use the website or access any of its content." *Id.*

Moreover, the cases in which courts have enforced browsewrap agreements have involved users who are businesses rather than, as in *Specht* and in this case, consumers. *Cf.* Lemley, *Terms of Use,* 91 Minn. L.Rev. 459, 472 (2006) ("An examination of the cases that have considered browsewraps in the last five years demonstrates that the courts have been willing to enforce terms of use against corporations, but have not been willing to do so against individuals."). Indeed, one prominent commentator has hypothesized that "[c]ourts may be willing to overlook the utter absence of assent only when there are reasons to believe that the [allegedly assenting party] is aware of the [other party's] terms." *Id.* at 477. And based on the reasonable supposition that such "awareness may be more likely with corporations than individuals, perhaps because corporations are repeat players," that commentator has argued "that if courts enforce browsewraps at all, enforcement should be limited to the context in which it has so far occurred—against sophisticated commercial entities who are repeat players." *Id.* at 464, 477.

On the other hand, it is not clear that these countervailing considerations apply to Facebook's Terms of Use. First, Fteja's allegation that he complied with the Terms of Use suggests that he had constructive knowledge of the Terms of Use, though it

is not clear from the complaint when he acquired that knowledge and he denies that he read the terms before signing up for his Facebook account.

Second, the Terms of Use were not exactly a true browsewrap license "in which the user does not see the contract at all but in which the license terms provide that using a Web site constitutes agreement to a contract whether the user knows it or not." Lemley, *Terms of Use*, 91 Minn. L. Rev. at 460. Indeed, in a pure-form browsewrap agreement, "the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website— the user is agreeing to and is bound by the site's terms of service." *United States v. Drew*, 259 F.R.D. 449, 462 n. 22 (C.D.Cal. 2009); *see also BoardFirst*, 2007 WL 4823761, at *4 ("Browsewraps may take various forms but typically they involve a situation where a notice on a website conditions use of the site upon compliance with certain terms or conditions, which may be included on the same page as the notice or accessible via a hyperlink."). In other words, a browsewrap agreement usually involves a disclaimer that by visiting the website—something that the user has already done—the user agrees to the Terms of Use not listed on the site itself but available only by clicking a hyperlink. Here, by contrast, the second Sign–Up page indicated that additional action beyond merely visiting that page, namely, clicking "Sign–Up," would manifest agreement to the Terms of Use.

In that sense, Facebook's Terms of Use have something in common with so-called "clickwrap" licenses, "in which an online user clicks 'I agree' to standard form terms...." Lemley, Terms of Use, 91 Minn. L.Rev. 459. *Cf. Drew*, 259 F.R.D. at 462 n. 22 ("Clickwrap agreements require a user to affirmatively click a box on the website acknowledging awareness of and agreement to the terms of service before he or she is allowed to proceed with further utilization of the website."). A clickwrap agreement "presents the potential licensee (*i.e.*, the end-user) with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the license agreement by clicking on an icon." *Register.com*, 356 F.3d at 429.

"Because the user has 'signed' the contract by clicking 'I agree,'" even commentators who have called for limits on browsewrap agreements find "nothing inherently troubling about enforcing clickwrap licenses." Lemley, Terms of Use, 91 Minn. L.Rev. at 466. And the courts appear to share that view, for [c]lickwrap agreements "have been routinely upheld by circuit and district courts." *Drew*, 259 F.R.D. at 462 n. 22. Indeed, numerous courts, including a number of courts in this Circuit, have enforced forum selection clauses in clickwrap agreements. *See, e.g., Segal v. Amazon.com, Inc.*, 763 F.Supp.2d 1367 (S.D.Fla.2011); *Meier v. Midwest Recreational Clearinghouse, LLC*, No. 2:10–cv–01026, 2010 WL 2738921 (E.D.Cal. July 12, 2010); *TradeComet.com LLC v. Google, Inc.*, 693 F.Supp.2d 370, 377–78 (S.D.N.Y.2010); *Beard v. PayPal, Inc.*, 2010 WL 654390 (D.Or. Feb. 19, 2010) (transferring case to Northern District of California); *Brodsky v. Match.com LLC*, No. 09 Civ. 5328, 2009 WL 3490277 (S.D.N.Y.2009); *Feldman v. Google, Inc.*, 513 F.Supp.2d 229, 237 (E.D.Pa.2007); *Person v. Google Inc.*, 456 F.Supp.2d 488, 496–97 (S.D.N.Y.2006); *Novak v. Overture Servs., Inc.*, 309 F.Supp.2d 446, 451 (E.D.N.Y.2004).

Yet Facebook's Terms of Use are not a pure-form clickwrap agreement, either. While the Terms of Use require the user to click on "Sign Up" to assent, they do

not contain any mechanism that forces the user to actually examine the terms before assenting. By contrast, in assenting to a clickwrap agreement, "users typically click an 'I agree' box after *being presented with* a list of terms and conditions of use . . ." *Hines,* 668 F.Supp.2d at 366 (emphasis added). That aspect of a clickwrap agreement ensures that "potential licensees are presented with the proposed license terms and forced to expressly and unambiguously manifest either assent or rejection prior to being given access to the product." *Register.com,* 356 F.3d at 429.

Courts have not overlooked this feature. For example, the Second Circuit in *Specht* found a "signal difference" between the software for which the defendant supplied only hyperlinked terms and other software for which users "were automatically shown a scrollable text of that program's license agreement and were not permitted to complete the installation until they had clicked on a 'Yes' button to indicate that they accepted all the license terms." *Specht,* 306 F.3d at 22–23. In addition, another court has interpreted the clickwrap case law for the proposition that, "[a]s a rule, a clickwrap is valid where the terms of the agreement appear on the same screen with the button the user must click to accept the terms and proceed with the installation of the product." *Grosvenor v. Qwest Commc'ns Int'l, Inc.,* No. 09–cv–2848, 2010 WL 3906253, at *2 (D.Colo. Sept. 30, 2010) (declining to enforce arbitration clause in clickwrap agreement where terms did not appear on the same page as the "Yes" box). And many of the decisions from this district support that reading. *Compare, e.g., TradeComet.com LLC,* 693 F.Supp.2d at 377–78 ("Google offers testimony and screenshots showing the status of Trade-Comet's AdWords accounts to support its contention that TradeComet accepted the August 2006 Agreement and that it had to click through the text of that agreement to

do so."), *and Feldman,* 513 F.Supp.2d at 237 ("[T]he AdWords Agreement gave reasonable notice of its terms. In order to activate an AdWords account, the user had to visit a webpage which displayed the Agreement in a scrollable text box."), *and Person,* 456 F.Supp.2d at 497 ("By clicking on a link, a user is taken to the agreement before assenting to its terms."); *and Novak,* 309 F.Supp.2d at 451 ("Prior to registration for access to the Google discussion groups, Plaintiff must accept the 'Terms and Conditions of Use for Google Groups.' On this page is a window for viewing the 'terms and conditions' contract and a button to indicate acceptance of the terms contained therein.") (internal citation omitted).

Thus Facebook's Terms of Use are somewhat like a browsewrap agreement in that the terms are only visible via a hyperlink, but also somewhat like a clickwrap agreement in that the user must do something else—click "Sign Up"—to assent to the hyperlinked terms. Yet, unlike some clickwrap agreements, the user can click to assent whether or not the user has been presented with the terms.

What result follows? Have terms been reasonably communicated where a consumer must take further action not only, as in a clickwrap agreement, to assent to the terms but also, as in a browsewrap agreement, to view them? Is it enough that Facebook warns its users that they will accept terms if they click a button while providing the opportunity to view the terms by first clicking on a hyperlink?

In answering that question, it is tempting to infer from the power with which the social network has revolutionized how we interact that Facebook has done the same to the law of contract that has been so critical to managing that interaction in a free society. But not even Facebook is so

powerful. As the Second Circuit has reminded us, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com*, 356 F.3d at 403. To make that point, the Court of Appeals has used a rather simple analogy. "The situation might be compared to one in which" Facebook "maintains a roadside fruit stand displaying bins of apples." *Id.* at 401. For purposes of this case, suppose that above the bins of apples are signs that say, "By picking up this apple, you consent to the terms of sales by this fruit stand. For those terms, turn over this sign."

In those circumstances, courts have not hesitated in applying the terms against the purchaser. Indeed, in *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 587, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991), the Supreme Court upheld a forum selection clause in fine print on the back of a cruise ticket even though the clause became binding at the time of purchase, and the purchasers only received the ticket some time later. *See id.* In other words, the purchasers were already bound by terms by the time they were warned to read them. Similarly, in *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7 (2d Cir.1995), the plaintiffs booked a vacation through Sun Life based on promotional materials that "carried the following message under the sub-heading 'Responsibility'":

> The transportation of passengers and baggage on the Stella Solaris … is governed by the terms and conditions printed on the Passenger Ticket Contract which may be inspected at any Sun Line office. Passenger's acceptance of that ticket constitutes agreement to those terms and conditions.

*Id.* at 8. On the Passenger Ticket Contract, "[t]he warning 'IMPORTANT NOTICE—READ BEFORE ACCEPTING'

[wa]s found in bold, capitalized, medium-sized lettering" and "[i]mmediately below the warning, in somewhat smaller print, the ticket purchaser's attention [wa]s directed specifically to the contract clause that limits choice of forum." *Id.* The Second Circuit held that the forum selection clause contained on the Passenger Ticket Contract bound the plaintiffs when they accepted their tickets even though they had been referred to those terms rather than shown them. *See id.* at 11.

There is no reason why that outcome should be different because Facebook's Terms of Use appear on another screen rather than another sheet of paper. What is the difference between a hyperlink and a sign on a bin of apples saying "Turn Over for Terms" or a cruise ticket saying "SUBJECT TO CONDITIONS OF CONTRACT ON LAST PAGES IMPORTANT! PLEASE READ CONTRACT–ON LAST PAGES 1, 2, 3"? *Shute*, 499 U.S. at 587, 111 S.Ct. 1522. The mechanics of the internet surely remain unfamiliar, even obtuse to many people. But it is not too much to expect that an internet user whose social networking was so prolific that losing Facebook access allegedly caused him mental anguish would understand that the hyperlinked phrase "Terms of Use" is really a sign that says "Click Here for Terms of Use." So understood, at least for those to whom the internet is in an indispensable part of daily life, clicking the hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket. In both cases, the consumer is prompted to examine terms of sale that are located somewhere else. Whether or not the consumer bothers to look is irrelevant. "Failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract." *See Centrifugal Force, Inc. v. Softnet Commc'n Inc.*, No. 08 Civ. 5463, 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011)

(enforcing clickwrap agreement in breach of contract action). Here, Fteja was informed of the consequences of his assenting click and he was shown, immediately below, where to click to understand those consequences. That was enough.

Several other courts have reached a similar conclusion on similar facts. *Hubbert v. Dell Corporation*, 359 Ill.App.3d 976, 296 Ill.Dec. 258, 835 N.E.2d 113 (Ill.App.Ct. 2005) involved an arbitration clause contained in terms and conditions of an online sale. "To make their purchases, each of the plaintiffs completed online forms on five ... Web pages." *Id.*, 296 Ill.Dec. 258, 835 N.E.2d at 118. On each of those pages, the 'Terms and Conditions of Sale' were accessible by clicking on a blue hyperlink." *Id.* The Court reasoned that "[t]he blue hyperlinks ... should be treated the same as a multipage written paper contract" because "[t]he blue hyperlink simply takes a person to another page of the contract, similar to turning the page of a written paper contract." *Id.*, 296 Ill.Dec. 258, 835 N.E.2d at 121. That followed because, in the court's view, "[c]ommon sense dictates that because the plaintiffs were purchasing computers online, they were not novices when using computers" and "[a] person using a computer quickly learns that more information is available by clicking on a blue hyperlink." *Id.*

The *Hubbert* court also noted that, "[o]n the last three forms, the plaintiffs completed online, the following statement appeared: 'All sales are subject to Dell's Term[s] and Conditions of Sale.'" *Id.*, 296 Ill.Dec. 258, 835 N.E.2d at 118. The Court concluded that "[t]his statement would place a reasonable person on notice that there were terms and conditions attached to the purchase and that it would be wise to find out what the terms and conditions were before making a purchase." *Id.*, 296 Ill.Dec. 258, 835 N.E.2d at 122. Accord-

ingly, the court held that "[t]he statement that the sales were subject to the ... 'Terms and Conditions of Sale,' combined with making the 'Terms and Conditions of Sale' accessible online by blue hyperlinks, was sufficient notice to the plaintiffs that purchasing the computers online would make the 'Terms and Conditions of Sale' binding on them." *Id.*

The court in *Major v. McCallister*, 302 S.W.3d 227, 230 (Mo.Ct.App.2009) reached a similar conclusion. In that case, the user of a construction contractor referral website purportedly assented to terms and conditions regarding any disputes that included a forum selection clause. As part of the website's registration process, the user provided identification information and then clicked a button to submit the registration. "Next to the button was a blue hyperlink to the website terms and this notice: 'By submitting you agree to the Terms of Use.'" *Id.* at 229. "A second link to those terms was visible on the same page without scrolling, and similar links were on every other website page." *Id.* at 230. On those facts, the court held that the user's "contention that the website terms were so inconspicuous that a reasonably prudent internet user could not know or learn of their existence, or assent to them without a 'click,' is unconvincing." *Id.* at 231.

The court in *Guadagno v. E*Trade Bank*, 592 F.Supp.2d 1263 (C.D.Cal.2008) also upheld an arbitration clause contained in terms and conditions accessible via a hyperlink next to a button on a registration page. "Before opening her account with E*Trade, Guadagno filled out an online application." *Id.* at 1267. On the page containing the application was the following notice: "The following contain important information about your account." *Id.* The notice "provide[d] a highlighted, bullet-pointed, underlined link to

the Agreement." *Id.* "Directly below the link [wa]s a box that applicants must check to proceed with opening an E\*Trade account" and "[t]he text next to the box state[d]: 'By checking this box, you acknowledge that you have reviewed the ... **Agreement** ....'" *Id.* (emphasis and ellipses in original). In those circumstances, the court held that "[a] reasonably prudent offeree would have noticed the link and reviewed the terms before clicking on the acknowledgment icon." *Id.* at 1271.

And finally, the court in *Snap-on Business Solutions Inc. v. O'Neil & Associates, Inc.,* 708 F.Supp.2d 669 (N.D.Ohio 2010) upheld terms and conditions for a "website [that] contains a single page access screen where users must input a user name and password and then click an 'Enter' button to proceed." *Id.* at 683. The court noted that "[b]elow the 'Enter' button, the page states: 'The use of and access to the information on this site is subject to the terms and conditions set out in our legal statement'" and that "[i]mmediately following this text is a green box with an arrow that users may click to view the entire" terms. *Id.*

For the reasons discussed above, the Court concludes that Fteja assented to the Terms of Use and therefore to the forum selection clause therein. If that is so, Fteja agreed to litigate all disputes regarding his Facebook account "exclusively in a state or federal court located in Santa Clara County," California. The federal court for that county is the Northern District of California. Accordingly, if the Court is correct that Fteja assented to the forum selection clause, "a significant factor that figures centrally in the district court's calculus" weighs in favor of transfer. *Stewart Org., Inc.,* 487 U.S. at 29, 108 S.Ct. 2239.

However, this does not end the inquiry. "The existence of a forum selection clause cannot preclude the district court's inquiry into the public policy ramifications of transfer decisions." *Red Bull Assocs. v. Best Western Int'l, Inc.,* 862 F.2d 963, 967 (2d Cir.1988). Accordingly, the Court will analyze other factors relevant to whether transfer would promote "the convenience of parties and witnesses" and "the interest of justice." 28 U.S.C. § 1404(a). On balance, these factors also weigh strongly in favor of transfer.

In this case, "the convenience of witnesses"—"the single most important factor," *Aerotel, Ltd. v. Sprint Corp.,* 100 F.Supp.2d 189, 197 (S.D.N.Y.2000)—as well as "the location of relevant documents and relative ease of access to sources of proof" tilt in favor of transferring this case to the Northern District of California.

■ The gravamen of Fteja's complaint is that Facebook, presumably through its employees, disabled his account without justification and for discriminatory reasons. Accordingly, his claims will turn largely on issues such as what Facebook employees did, what they knew about Fteja's account, their reasons for disabling that account, and their motives for doing so. Evidence as to those issues seems likely to consist almost entirely of (a) documents recording Facebook's actions and/or Fteja's account files; and (b) depositions of Facebook employees responsible for monitoring and disabling accounts. *See Pragmatus AV, LLC v. Facebook, Inc.,* 769 F.Supp.2d 991, 995–96 (E.D.Va.2011) (transferring action against Facebook to Northern District of California where, *inter alia,* employees with knowledge of the company's allegedly unlawful activities were present in that district); *Mekiki Co., Ltd. v. Facebook, Inc.,* No. 09–745, 2010 WL 2348740, at \*3 (D.Del. June 7, 2010) (same where "acts giving rise to the dispute ... occurred at Facebook's headquarters in Palo Alto"). Those documents and

employees reside at Facebook's headquarters in Palo Alto. (Yang Dec. ¶¶ 3, 4.)

It is true that Fteja will also have to prove that he was harmed by Facebook's actions. And it seems not unlikely that Fteja experienced some, if not most, of the harm to his personal relationships in New York. However, to the extent that is so, Fteja suffered the harm in large part at his home in Staten Island, which is part of the Eastern District of New York. *Cf. United States v. Gotti*, No. X5 02 CR 743, 2004 WL 602689, at *8 (S.D.N.Y. Mar. 26, 2004) ("Both Staten Island and Brooklyn are located in the Eastern District of New York."). While Fteja claims that "[all] his potential witnesses ... are located near [him]" (Pls.' Opp'n ¶ 6), Fteja does not identify any witness, never mind a witness who resides in or close to this district, who will testify to the effect of the disabling of Fteja's account on his or her relationship with Fteja. What is more, given Facebook's global reach and that Fteja left behind his "whole family" when he immigrated to the United States in 1992, it seems almost as likely that any such witness would reside halfway around the world as in New York. (Pls.' Opp'n ¶ 8.)

"The locus of operative facts" also appears to be California. Fteja's claim that Facebook wrongfully disabled his account sounds largely in contract. And "[t]he locus of operative facts in a breach of contract case looks at 'where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred.'" *Reinhard v. Dow Chem. Co.*, No. 07 Civ. 3641, 2007 WL 2324351, at *6 (S.D.N.Y. Aug. 13, 2007) (quoting *Prudential Secs. v. Norcom Dev., Inc.*, 1998 WL 397889, at *4 (S.D.N.Y. July 16, 1998)). It is somewhat difficult to apply this framework to the Facebook Terms of Use. But with respect to the first consideration, it might be said that Facebook

drafted the Terms of Use and maintained the website offering access to Facebook pursuant to those terms from its headquarters in Palo Alto and that Fteja appears to have accepted the Terms from his home in New York. The second factor is hardly relevant to the social networking context, since the service for which the parties contracted—access to a Facebook account—was, almost by definition, intended to be available anywhere in the world. However, the third factor is straightforward: the alleged "breach" or wrongful disabling was carried out in Palo Alto by Facebook employees responsible for monitoring and disabling accounts.

Again, the Court is not unaware that Fteja may have experienced his alleged harm in the New York area. However, that possibility does not weigh strongly against transfer for three reasons. First, courts addressing motions to transfer cases sounding in contract have not considered that fact in determining the locus of operative facts. Second, even where the plaintiff alleges that the defendant made tortious business decisions in one state causing harm in another state, courts have focused on where the wrongful acts occurred, not where the plaintiff experienced the effects of those acts. *See, e.g., Aguiar v. Natbony*, No. 10 Civ. 6531, 2011 WL 1873590, at *9 (S.D.N.Y. May 16, 2011).

And third, while it may be true that "there is no requirement that there be a 'substantial' nexus between the chosen forum and the claim for the choice of forum to receive deference," there nevertheless "must be some material relation." *Adams v. Key Tronic Corp.*, 1997 WL 1864, at *3 (S.D.N.Y. Jan. 2, 1997). Yet Fteja has not alleged that any harm occurred in this district as opposed to in Staten Island. Indeed, though Fteja claims that "[a]ll of the facts occurred here in New York State" (Pls.' Opp'n ¶ 6), he has not pointed

to any operative fact of any kind that occurred in this district. That suggests that this district is not only an inconvenient but possibly an improper venue for this action, since it could hardly be said that this is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred...." 28 U.S.C. § 1391(a)(2). In any event, the dearth of any connection to this district strongly militates in favor of transferring the action from this district.[2]

Certainly the foregoing suggests that, as the "convenience of the parties" is concerned, Facebook would find the Northern District of California far more convenient. And while that district would be more inconvenient for Fteja, "the courts of this circuit have emphasized that '[a] forum is not necessarily inconvenient because of its distance from pertinent parties or places if it is readily accessible in a few hours of air travel.'" *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 10 (2d Cir.1995) (quoting *Calavo Growers of California v. Generali Belgium*, 632 F.2d 963, 969 (2d Cir.1980) (Newman, J., concurring), *cert. denied*, 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981)).

It remains to consider "the plaintiff's choice of forum" and "the relative means of the parties." It is true that, "[i]n considering a motion to transfer, the plaintiff's choice of forum is generally afforded great weight." *Medien Patent Verwaltung AG v. Warner Bros. Entm't, Inc.*, 749 F.Supp.2d 188, 190 (S.D.N.Y.2010). And "[t]his deference stems from the presumption that a plaintiff selects a forum based on convenience." *Id.* "However, the emphasis placed by a court on this choice diminishes where the operative facts upon which the litigation is brought bear little material connection to the chosen forum." *Capitol Records, LLC v. VideoEgg, Inc.*, 611 F.Supp.2d 349, 368 (S.D.N.Y.2009) (quotation marks omitted). For the reasons set forth above, the operative facts underlying this action have almost no connection to this district. Accordingly, the Court gives far less deference to Fteja's decision to file his action in a state court in this district.[3]

2. To be sure, it was Facebook who removed this action to this district. But that removal was a function of the fact that Fteja filed the action in New York Supreme Court for New York County, which is in this district. Indeed, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States *for the district and division embracing the place where such action is pending.*" 28 U.S.C. § 1441(a) (emphasis added).

3. As a resident of Staten Island, Fteja is also not a resident of this district. And some courts in this district have held that "[w]hile a plaintiff's choice of forum should be accorded some deference, that consideration is not entitled to the same weight where a plaintiff is not a resident of the forum district or the operative facts are centered in another district." *Zepherin v. Greyhound Lines Inc.*, 415 F.Supp.2d 409, 411 (S.D.N.Y.2006); *see also*

*Erick Van Egeraat Associated Architects B.V. v. NBBJ LLC*, 2009 WL 1209020, at *5 (S.D.N.Y. Apr. 29, 2009). However, in the *forum non conveniens* context, the Second Circuit has stated that "[i]t is not a correct understanding of the rule to accord deference only when the suit is brought in the plaintiff's home district. Rather, the court must consider a plaintiff's likely motivations in light of all the relevant indications." Under that approach, courts "give greater deference to a plaintiff's forum choice to the extent that it was motivated by legitimate reasons, including the plaintiff's convenience ... and diminishing deference to a plaintiff's forum choice to the extent that it was motivated by tactical advantage." *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73 (2d Cir.2001).

"Although Iragorri dealt with forum non conveniens, its reasoning is equally applicable to determinations of convenience under § 1404(a)," *Medien Patent Verwaltung AG v. Warner Bros. Entertainment, Inc.*, 749

"In determining whether the relative means of the parties weighs in favor of transfer, 'a court should determine whether a party's financial situation would meaningfully impede its ability to litigate this case in either forum.'" *AIG Fin. Prods. Corp. v. Public Utility Dist. No. 1 of Snohomish County, Wash.*, 675 F.Supp.2d 354, 372 (S.D.N.Y.2009) (quoting *Truk Int'l Fund v. Wehlmann*, No. 08 Civ. 8462, 2009 WL 1456650, at *7 (S.D.N.Y. May 20, 2009)) (quotation marks omitted). Yet "where proof of such disparity is not adequately provided, or does not exist, this is not a significant factor to be considered." *American Eagle Outfitters, Inc. v. Tala Bros. Corp.*, 457 F.Supp.2d 474, 478 (S.D.N.Y.2006). Though Fteja is proceeding *pro se*, he has not provided any evidence that his "financial situation would meaningfully impede [his] ability to litigate this case in the Northern District of California." *AIG Fin. Prods. Corp.*, 675 F.Supp.2d at 372. Indeed, Fteja has not even argued as much. Since "[t]he relative economic ability of the parties to proceed with a case has rarely been a dispositive reason to grant or deny a venue change" but is instead "but one of several factors for the court to consider," *Kolko v. Holiday Inns, Inc.*, 672 F.Supp. 713, 716 (S.D.N.Y.1987), it makes little sense to reject transfer on a ground Fteja has not advanced and where the Court has no evidence in a case where essentially all the other factors weigh in favor of transfer.

Fteja does argue that he is "disabled from Ménière's disease ... an inner ear disorder" that "is often associated with the symptons of spinning and dizziness." (Pl.'s Opp'n ¶ 7.) However, Fteja does not state why this disorder would prevent him from litigating the action in the Northern District of California but has not prevented him from litigating the action in this district. The Court considered the possibility that an ear disorder would affect Fteja's ability to travel to California should the need arise, but the Court's research did not uncover any literature recommending that a person suffering from Ménière's disease should not fly. *Cf.* National Institute on Deafness and Other Communication Disorders [part of the National Institute of Health], *Ménière's Disease*, http://vestibular.org/images/pdf/Menieres% 20Disease_VEDApubF4.pdf; P.J. Haybach & the Vestibular Disorders Association, *Ménière's Disease*, http://vestibular.org/images/pdf/Menieres% 20Disease_VEDApubF4.pdf.

In sum, Fteja has not pointed to any significant connection between his action and this district, where he has chosen to bring it. On the contrary, essentially all of the relevant factors suggest that litigating this action in the Northern District of California would be far more logical, convenient, and just. And Fteja does not point to any evidence or persuasive reason to the contrary. Accordingly, Facebook has met its burden to show that transfer is warranted.

## CONCLUSION

For the foregoing reasons, Facebook's motion [4] to transfer is GRANTED. The Clerk of Court is directed to transfer this action to the docket of the United States District Court for the Northern District of California. Fatouros's motion [12] to join

---

F.Supp.2d 188, 190 (S.D.N.Y.2010), and courts in this Circuit have applied it in that context. *See, e.g., Imagine Solutions, LLC v. Medical Software Computer Sys., Inc.*, No. 06 CV 3793, 2007 WL 1888309, at *13 (E.D.N.Y. June 28, 2007). The Court finds no reason to believe that Fteja chose this forum for tactical reasons. Accordingly, the Court declines to give any less deference to Fteja's choice of forum on the ground that he is not a resident of this district.

the action is DENIED without prejudice for administrative reasons.

SO ORDERED.