IT STRATEGIES GROUP,
INC., Plaintiff,

v.

The ALLDAY CONSULTING GROUP,
L.L.C., Danny Dean Allday and
Trang Tran, Defendants.

Case No. 13–60014–CIV.

United States District Court,
S.D. Florida.

Sept. 30, 2013.

Garrett Ari Barten, Christopher & Weisberg, Fort Lauderdale, FL, for Plaintiff.

Matthew Scott Nelles, Tara Ravi, Broad and Cassel, Fort Lauderdale, FL, for Defendants.

### ORDER ADOPTING MAGISTRATE'S REPORT AND RECOMMENDATION

ROBERT N. SCOLA, JR., District Judge.

THIS MATTER was referred to the United States Magistrate Judge Lurana S. Snow for a Report and Recommendation on the Plaintiff's Motion for Preliminary Injunction (ECF No. 26). On September 9, 2013, Judge Snow issued a Report, recommending that the Motion be denied. (Report of Magistrate, ECF No. 96.) No objections have been filed and the time to object has passed. Having considered Judge Snow's Report, the record, and the relevant legal authorities, this Court finds Judge Snow's Report and Recommendation cogent and compelling.

It is **ORDERED and ADJUDGED** that Judge Snow's Report and Recommendation (ECF No. 96) is **AFFIRMED and ADOPTED.** The Plaintiff's Motion for Preliminary Injunction (ECF No. 26) is **DENIED.**

**DONE AND ORDERED.**

### REPORT AND RECOMMENDATION

LURANA S. SNOW, United States Magistrate Judge.

THIS CAUSE is before the Court on the Plaintiff's Motion for Entry of Preliminary Injunctive Relief Against Defendants (DE 26), which was referred to United States Magistrate Judge, Lurana S. Snow, for a Report and Recommendation. The motion is fully briefed and an evidentiary hearing was conducted by the undersigned on July 25, 2013 and August 7–9, 2013.

### I. BACKGROUND

The Plaintiff corporation markets computer program software under the name "OILCLAIM CALCULATOR" which is directed to the assessment of money damages resulting from the Deepwater Horizon blowout, which occurred in the Gulf of Mexico in 2010. The Defendants are involved in the marketing of software which also assists in the preparation of claims for damages resulting from the blowout. On April 18, 2013, the Plaintiff filed its Second Amended Complaint, containing seven claims for relief against the Defendants: Count I: Trademark Infringement Under the Lanham Act; Count II: Trade Dress Infringement Under the Lanham Act; Count III: Unfair Competition Under the Lanham Act; Count IV: Florida Common

Law Unfair Competition; Count V: Common Law Fraud; Count VI: Fraud on the United States Patent and Trademark Office, and Count VII: Breach of Contract–Injunctive Relief. (DE 25)

On April 25, 2013, the Plaintiff filed the instant motion, asserting that a preliminary injunction is warranted based on its claims breach of contract and trade dress infringement. According to the Plaintiff, "OILCLAIM CALCULATOR" a/k/a "Oil Claim Calculator" is a common law trademark, and its advertising contains a protectable trade dress. In addition, the Plaintiff asserts that the Defendants, by obtaining a free trial of the Plaintiff's software, were bound by an online user agreement not to copy or reproduce the Plaintiff's product.

Regarding the Plaintiff's claim of trade dress infringement, the Second Amended Complaint alleges, in pertinent part:

16. The trade dress of Plaintiff's product is advertised, promoted, marketed and sold having non-functional distinctive features which consumers have come to associate with Plaintiff and its product. Specifically, Plaintiff's business model trade dress includes a product that is accessed digitally by its customers upon purchase. In order to connote to the consuming public that its product is for retail/wholesale, Plaintiff has created a trade dress virtual, consumer-oriented box package for aesthetic purposes only. Defendant copied identical concept and virtual, consumer-oriented packaging bearing the same mark as Plaintiff. The package comprises the Mark, and picture of a calculator to reinforce the term "calculator" that is part of the overall Mark. The calculator includes, in part, a base member having a curved line. The package

is two-tone, wherein the tones are demarcated by a curve....

\* · \* \*

20. Well after Plaintiff began using its Mark and trade dress in commerce of the United States, Defendants commenced advertising, promoting, marketing and selling, through the world wide web, at continuing professional education events, and by trade publications, damages assessment computer software under a mark OIL CLAIM CALCULATOR and a trade dress which are reproductions, copies and/or colorable imitations of Plaintiff's Mark and trade dress....

21. Upon information and belief, and like Plaintiff, Defendants sell the imitation of Plaintiff's goods sold under the Mark and Plaintiff's trade dress virtually and exclusively through the word wide web, by allowing consumers throughout the United States to have cloud-based access to, or by download of, the infringing software. In addition to Defendants' misappropriation of Plaintiff's style of doing business relative to Plaintiff's software goods, Defendants copied Plaintiff's trade dress to include a virtual, consumer-oriented box package .... The package dimensions appear identical to Plaintiff's package, and comprises the infringing mark and a picture of a calculator. The calculator picture includes, in part, a curved member in a manner similar to that of Plaintiff's calculator shown on its virtual box package. The Defendants' box is substantially two-tone, wherein the tones are demarcated with a curved line in the color black.

\* \* \*

24. Defendants, prior to their infringing conduct, gained access to the web site of Plaintiff for the purpose of reviewing and analyzing Plaintiff's soft-

ware bearing the Mark and trade dress, on a trial basis, representing themselves to be a potential business customer who was interested in purchasing Plaintiff's goods for their use in counseling the corporate defendant's accounting and consulting clients.

25. The representations made to Plaintiff by Defendants regarding their desire to purchase Plaintiff's software were material and false, and meant only to review the software and its functionality for the purpose of copying them and Plaintiff's confidential business materials, including, but not limited to, Plaintiff's sales and business model and style, including, but not limited to, marketing strategy, pricing model, and proposal format.

(DE 25 at 3–5)

The breach of contract claim, set forth in Count VII of the Second Amended Complaint, seeks only injunctive relief and states, in pertinent part:

73. On or about August 22, 2013, Defendants submitted an online request to Plaintiff to consider purchasing Plaintiff's software, and were provided with an online login username and password to gain access to Plaintiff's software. . . .

74. Defendants gained access to Plaintiff's software using the provided username and password. In so doing, the Defendants agreed to certain confidentiality provisions and use restrictions, in accordance with [a security warning].

75. Part of Defendant's acceptance of the confidentiality provision and use restrictions of Plaintiff's software and business model included acceptance of the terms contained in a July 2012 version Online User Agreement.

*Id.* at 15–16.

The Online User Agreement provides, in pertinent part:

Customer shall not and shall not allow any third party to (a) reproduce or modify the OilClaim Calculator, (b) provide, rent, lease, disclose, use for time sharing or service bureau purposes, or otherwise transfer or distribute the OilClaim Calculator or any part thereof for the use by a third party, or (c) reverse assemble, reverse compile or reverse engineer the OilClaim Calculator, or otherwise attempt to discover any of its source code or underlying proprietary information (except to the limited extent that applicable law prohibits such a reverse engineering restriction).

(Defendant's Exhibit 4)

## II. FACTS PRESENTED

At the evidentiary hearing, the Plaintiff called as its first witness, Daniel Jacobs, Vice President of the Plaintiff corporation. Mr. Jacobs is a software developer who was hired by the Plaintiff in April 2012 to review the BP settlement agreement and turn it into a claims management system that would be useful for clients. The intent was to create a "business to business" product for sale to businesses who service consumers. At that time, no similar program was available, and the Plaintiff's product required 2500 man-hours to develop.

Mr. Jacobs explained that the software he developed is logic-driven and consumer-friendly, similar to programs such as Turbo Tax. In late May or early June 2012, the product was named "oilclaim calculator." In the first or second week of June 2012, a website was created to educate CPAs and law firms about their ability to represent claimants. Mr. Jacobs created a faux virtual packaging for the product, but it never was intended to be sold in box form.

Mr. Jacobs stated that he became aware of the Defendants on August 22, 2012,

when they requested a free demonstration of the product, via an e-mailed application. (Plaintiff's Exhibit 4) Mr. Jacobs explained that the only way to access the free trial was through the website oilclaimcalculator.com. At the bottom of each page of the website is a hyperlink entitled "terms" which directs the user to· the terms and conditions of use. After the free demonstration, the Defendants did not purchase the software.

Mr. Jacobs testified that he met the Defendant, Danny Allday in October 2012 at a round table meeting of Louisiana CPAs. At that time, Mr. Allday described the Plaintiff's product as the "Cadillac" of oil claim calculators. In addition, Mr. Allday allowed representatives of the Plaintiff to answer some of the questions posed to Mr. Allday by CPAs present at the meeting.

Mr. Jacobs discovered that the Defendants were selling competing software under the Plaintiff's trademarked name on three websites that had been created in August, October and November 2012. Mr. Jacobs contacted the Plaintiff's attorney to report that the Defendants were using the same name for their product, as well as extremely similar marketing material. Mr. Jacobs was concerned about consumer confusion, especially since several people had asked whether the Plaintiff and the Defendants were the same company or were selling the same product.

Mr. Jacobs identified several computer "screen shots" of the Plaintiff's product containing material that was not required by the BP settlement, but which were similar to pages in the Defendant's program. He stated that in November 2012, Mr. Allday made unsuccessful attempts to register the trademarks "BP Claim Calculator," "Oil Claim Calculator," and "BP Oil Claim Calculator." Moreover, on Mr. Allday's Linkedin profile, he claims to have invented the calculator. Mr. Jacobs added that the Plaintiff spends $13,000 to $20,000 per month for advertising.

On cross examination, Mr. Jacobs conceded that the Plaintiff's application for a trademark also was denied. He stated that he did not believe that the Defendants were using their own software as of September 2012, the time of their free trial of the Plaintiff's software, because they told him on the phone that they needed a calculator, but did not yet know how to create one. He acknowledged that no source code was provided to the Defendants on the day the free demonstration was provided and he does not know if the Defendants ever received one. Mr. Jacobs stated although the log-in page for the free trial contained a security warning and a confidentiality notice,[1] he did not know if any

---

1. The warning displayed on the log-in page for free trial users states:

   Security Warning: You are attempting to access a private computer system. Unauthorized access is prohibited. System use is monitored and recorded, therefore users should have no expectation of personal privacy when using this system. Anyone accessing this system agrees to use the system only as authorized and expressly consents to such monitoring. OCC reserves the right to access, use and disclose any and all information on the system as provided or allowed by federal or state law.

   Confidentiality notice: This system contains confidential information belonging to OCC. It may also be privileged or otherwise protected by work product immunity or other legal rules. The information is intended only for the use of the individual or entity named above. If you are not the intended user, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this confidential information is strictly prohibited.

   You agree to comply with all confidentiality and security requirements that OCC may impose for use of their implementation of

representative of the Defendants ever reviewed the online user agreement. Mr. Jacobs also did not know if, at the time of the free trial, every page of the website contained a hyperlink to the terms and conditions.

When shown a screen shot of the online user agreement on the Plaintiff's website which indicated that the document had been created in October 2012, Mr. Jacobs testified that this was the result of a typographical error by one of the web masters at the time a new page header was created. He acknowledged that on April 19, 2013, he sent the following email to Mike Haynes, one of the Plaintiff's employees:

> The problem is the file name that is displaying at the top.
>
> We do not want it saying 10–12.
>
> It should use the filename I sent you that says "ITSG Online User Agreement and Terms.pdf" nothing else.

(Defendant's Exhibit 5)

> Mr. Haynes responded:
>
> I had only updated it on ITSG. Didn't Realize I was supposed to update it on OCC too. Done. http://www.oilclaim calculator.com/terms.

*Id.*

Mr. Jacobs denied knowing that the October 2012 date was pointed out by the Defendants in court papers filed four days prior to this email exchange.

Finally, Mr. Jacobs conceded that the functionality of the Plaintiff's claim listing, client information and other screens was more extensive than that contained in the Defendants' program.

The Plaintiff called as its next witness, Craig Sienema, also a Vice President of the Plaintiff corporation. Mr. Sienema testified that the Plaintiff was created solely for the oil claim calculator. There are seven employees, each of whom deals with the software. The sales model is business to business. The Plaintiff began selling its software in early June 2012 from the website oilclaimcalculator.com.

Mr. Sienema identified screen shots from the website, each of which contained a hyperlink "terms." He explained that clicking on this hyperlink would take the user to the online user agreement, and that in order to obtain a free trial, a user was required to click through three pages of the website, each of which contained the "terms" hyperlink.

Mr. Sienema recalled meeting Defendant, Danny Allday at a round table meeting in October 2012. Both men made presentations at that meeting, but Mr. Allday did not have his own calculator. Mr. Allday told Mr. Sienema that he was developing his own calculator. Mr. Sienema informed Mr. Allday that the Plaintiff licensed its software to process claims. At the end of the presentations, Mr. Sienema answered questions on Mr. Allday's behalf because Mr. Allday did not have the information necessary to respond.

Mr. Sienema stated that he became aware that the Defendants were selling competing software at a trade show which took place in December 2012. According to Mr. Sienema, the Plaintiff's growth initially was very strong, but it declined in 2013 and it became necessary to fire three employees. He related that the Defen-

---

the Oil Claim Calculator, and you agree not to circumvent such security requirements. By clicking "Log In" you are agreeing to these terms.
(Defendant's Exhibit 6) Mr. Jacobs testified that he adapted this language from a prior

project he had done for the Defense Department, and acknowledged that there was no "terms" hyperlink at the bottom of the log-in page.

dants also have a web based program, with a similar price structure involving bundling. Also, in April 2013 the Plaintiff's marketing strategy added the use of a countdown clock to indicate the time left for filing claims.[2] One·week later, the Defendants began using a countdown clock in their advertising.

On cross examination, Mr. Sienema acknowledged that he had reported Mr. Allday to the Louisiana Society of CPAs, and had sent a copy of the Plaintiff's complaint to that organization. Mr. Sienema also conceded that there was no corroborating evidence that the "terms" hyperlink appeared at the bottom of the Plaintiff's website pages in August 2012. Mr. Sienema stated that the most important component of the Plaintiff's "bundle" was the number of claims, and that unlike the Defendants, the Plaintiff does not sell its software. On redirect examination, Mr. Sienema pointed out that the Defendant's pricing structure is substantially lower than that of the Plaintiff.

Joshua Leidolf testified next for the Plaintiff. Mr. Leidolf stated that he is employed by the Plaintiff as Director of sales. Mr. Leidolf stated that he received an application form for a free trial from Defendant, Trang Tran on behalf of the Defendants. Mr. Leidolf explained that the standard trial period is 48 hours, but this initially was extended to 72 hours at Ms. Tran's request. Later the period was further extended to one week.

Mr. Leidolf testified that an appointment was made for an online walk-through, which took thirty to forty minutes. He recalled speaking to Ms. Trang and Mr. Allday, and that questions were asked during the presentation. Mr. Leidolf made several follow-up calls to the Defendants, but received no response for several weeks. Ultimately, the Defendants told him that they decided not to buy because there was a "bug" in the software. Mr. Leidolf was surprised to hear this because many claims had been successfully processed with the Plaintiff's software. Mr. Leidolf testified that the Plaintiff had lost several clients because the Defendant's competing software was cheaper.

On cross examination, Mr. Leidolf admitted that no non-disclosure agreement was signed by the parties prior to the free trial. He also conceded that he had told some potential customers that the Plaintiff was suing Mr. Allday in federal court. Mr. Leidolf acknowledged that a potential customer does not have the ability to control the Plaintiff's software during the walk-through. Finally, Mr. Leidolf stated that the Plaintiff's software does not have an unlimited claim option.

The Plaintiff called as its own witness Defendant, Trang Tran. Ms. Tran testified that she recently resigned from employment at The Allday Consulting Group for health reasons, but that at the times relevant to the instant case, she was employed by Allday Consulting as office manager and web master. She has a bachelor's degree in information technology and has studied software development. Ms. Tran is skilled in web design and she designed Allday Consulting's website while she was still in college.

Ms. Tran stated that in August 2012, the Defendants had an Excel-based program for processing BP claims and were offering their services to file claims on behalf of their business customers, but they had nothing available online. Ms. Tran was directed to find a way to make the Defendants' calculator accessible online, and to make this a priority. The Defendants had

**2.** The time for filing claims expires in April 2014.

created Excel spreadsheets for use in computing claims. Ms. Tran successfully converted the causation spreadsheets into a web-based program, which she uploaded onto the Defendants' website. However, she found that the project was taking too much time away from her other responsibilities, and she decided to look for an existing program for calculating the amount of compensation, which the Defendants might be able to purchase.

Ms. Tran searched the internet for a product, and the Plaintiff's software was the only product she found that was capable of processing multiple claims. She arranged for a free demonstration, and notified Mr. Allday by e-mail about the trial. In that e-mail, Ms. Tran used quotation marks around the words "oil claim calculator" to denote that it was someone's product, and included a link to the IT Strategies website and to www.oilclaimcalculator.com.

Ms. Tran stated that before accessing the form she used to request a free trial of the Plaintiff's product, she first had to click on the website home page and a second page. She did not notice or click on a "terms" hyperlink at the bottom of the web pages. When speaking to Mr. Leidolf, Ms. Tran did not ask anything about the user terms because she only was interested in seeing the product. During the demonstration, Ms. Tran asked no questions, but Mr. Allday and another CPA named David Dominique did ask questions.

Ms. Tran testified that when arranging for the demo, she requested an additional 24 hours because Mr. Dominique was not immediately available. She stated that it was Mr. Leidolf who offered to give them one week, which Ms. Tran accepted. Ms. Tran explained that she was not interested in playing with the software herself because she doesn't handle claims and is not very familiar with the BP settlement.

Ms. Tran related that she did not discuss the Plaintiff's software with Mr. Allday and Mr. Dominique until after the trial was finished. Mr. Dominique told her that there was a computation missing in that software that he believed to be important. After the demo, Mr. Leidolf called multiple times to see if they were going to purchase the product. Mr. Allday decided that they would continue to develop their own software because the Plaintiff's product was too expensive and did not meet their needs.

Ms. Tran stated that she continued her work on the compensation component of the Defendants' software, but denied using the Plaintiff's software as a template. Mr. Dominique helped her to understand the calculations. The Defendants were trying to determine whether to improve their Excel spreadsheets or to continue work on developing a web-based program. At a CPA meeting, they learned from the other attendees that the CPAs preferred the Excel version and wanted it to contain additional features. As a result, Ms. Tran stopped working on the web-based compensation program, and they hired an individual named Ryan to work on the Excel improvements. Ms. Tran stated that she did not discuss anything about the Plaintiff's software with Mr. Ryan.

Ms. Tran testified that she designed the advertising for the Defendants' product. She stated that she did not use the name "oil claim calculator" because the Plaintiff used that name. She stated that it was important to the Defendants to identify the product as one created by a CPA firm. Ms. Tran explained that the names used by the Defendants were developed in part based on key words used in Google searches.

Ms. Tran stated that she had created the advertising design for the Defendants' product using a picture of a box. She explained that the Defendants had sold software in the past and always used a picture of a box in their ads, and stated that she did not look at the box used in the Plaintiff's ads before creating her design for the Defendants' product. Ms. Tran added that she made an effort to create an ad that did not look like the one used by the Plaintiff. Ms. Tran had created a few different mockups, which she submitted to Mr. Allday, and he selected the one with the box.

Ms. Tran testified that it was Mr. Ryan who added the countdown clock. She did not know whether the Plaintiff had a similar clock in their ads and did not know where the Plaintiff placed their ads. Ms. Tran had seen the Plaintiff's ads in an accounting magazine called *The Lagniappe.*

On cross examination, Ms. Tran related that when she worked on the Defendants' online causation and compensation calculators, she wrote her own code using an html editor. She stated that she found the Plaintiff's website by means of a Google search, which revealed that the Plaintiff was the only entity offering an actual product instead of services. She was not surprised to find that a product existed, but was surprised at the name "oil claim calculator," which merely described the product. She used the name in quotations in her email to Mr. Allday because it denoted an existing product.

Ms. Tran stated that she never looked at the Plaintiff's terms or signed any agreement when arranging for the free trial. She added that it never was her intent to copy anything. Ms. Tran testified that the Defendant's Excel causation and compensation spreadsheets were complete and she already had converted the causation spreadsheets to a web-based program before she contacted the Plaintiff. However, she did not finish her work on converting the compensation Excel spreadsheets to a web-based program until after the demo of the Plaintiff's product. She ceased working on the conversion process after the round table meeting at which the CPAs stated that they preferred the Excel program. It was at that time that Mr. Ryan was brought in to work on improving the spreadsheets.

Ms. Tran did not know if there was a "terms" hyperlink on the Plaintiff's website at the time she submitted the application for a free trial. When she performed an online check, her search indicated that the user agreement dated October 1, 2012 was put online on October 14, 2012, and there was nothing to indicate that the page had existed before that date.

Ms. Tran also stated that the entire team preferred the ad design which used a picture of a box. She testified that Mr. Allday always preferred to use the color blue, and that she used a check mark as an indicator of accounting services. Ms. Tran denied copying the Plaintiff's use of a curve.

The Plaintiff's next witness was David Dominique, an accountant who has been employed by Allday Consulting since May 2011. Mr. Dominique testified that he has no IT training or experience. He stated that in August 2012, he created a compensation calculator for the Defendant, which utilized an Excel spreadsheet for a single claim user. This calculator became a commercial product, with the first one sold one to three months after the Defendant's trial of the Plaintiff's product.

Mr. Dominique related that he became aware of the Plaintiff when Ms. Tran told him that she had signed up for a free trial of their product. Mr. Dominique partici-

pated in the trial, which did not require him to go to the Plaintiff's website. He clicked on the link provided by the Plaintiff and utilized the user name and password that had been provided by the Plaintiff. Mr. Dominique logged in no more than two or three times and did not read the text of the security warning.

Mr. Dominique testified that he was not involved in the choice of name for the Defendant's calculator. He performed demonstrations of the calculator on Fridays, and attended the round table meetings in October and December 2012. Mr. Dominique stated that the Defendant's calculator was called different names, most commonly the online causation calculator. On cross examination, he stated that the Defendant's were selling earlier versions of their calculator in August 2012.

The Plaintiff next called Defendant, Danny Allday, who testified that he is the sole owner of Allday Consulting, which provides accounting services and also sells calculator and websites designed by Ms. Tran. Mr. Allday obtained his CPA license in May 1978 and started his own practice in 1981. He does accounting, business planning, teaching and consulting.

Mr. Allday related that in July 2012, after the BP settlement was finalized, he decided that his firm should develop a tool for calculating losses to assist his clients who were not equipped to process claims. He realized that the spreadsheets the firm had developed could be sold, allowing clients to make their own calculations, and began selling the spreadsheets in August 2012. At that time, he did not sell any software under the name "oil claim calculator," and knew that the Plaintiff was doing so. Mr. Allday stated that he never marketed his product with the words "oil claim calculator" standing alone, and never strung the words "oil claim" together as one word, which the Plaintiff did.

Mr. Allday identified an e-mail (Plaintiff's Exhibit 40) in which he indicated his desire to either purchase calculation software or develop his own. He was aware that other CPAs had already developed their own calculators for internal use.

Mr. Allday testified that his presentation at the October 2012 round table meeting was cut short because the Plaintiff's representatives were late and had to use some of Mr. Allday's equipment for their presentation. At the conclusion of the meeting, the Plaintiff's people took over answering questions before Mr. Allday could answer them. After the meeting, one of the Plaintiff's representatives told Mr. Allday that it was the Plaintiff's market and they did not want competition. The representative added that others who had tried to compete were no longer in business.

Mr. Allday acknowledged that he registered three domain names for marketing his product: BPClaimsCPA.com was created in August 2012; BPClaimCalculator.com was created on October 17, 2012, and BPOilClaimCalculator.com was created on November 27, 2012. He stated that he created these names by incorporating words that people look for in their web searches. His product was called several different names, also based on search terms.

Mr. Allday testified that he became concerned about the Plaintiff's use of the circle "R" because his research indicated that the Plaintiff did not have a registered trademark. Mr. Allday registered the name "oil claim calculator" and other names with the State of Louisiana to ensure that he could use the names. On November 20, 2012, Mr. Allday filed a federal trademark application for the name "oil claim calculator," believing that if he was the first to register the mark he would have the right to use it. He did not be-

lieve his product was the same as that of the Plaintiff, because their software could not be downloaded by the user. Mr. Allday stated there were other differences between the products, but these were not apparent from the description of his product on his federal trademark application.

Mr. Allday explained that the idea to use a countdown clock on his website came from billboards and other ads he had seen. He stated that he did not learn that the Plaintiff also had one until after his went online. Mr. Allday testified that he first marketed his product in August 2012, with the first sales made in September 2012. He has made 50 to 100 software sales, with sales revenues comprising less than 10% of his firm's earnings. The software sales are business to business, going to CPA firms and law firms. Mr. Allday has hired people to market his software.

On cross examination, Mr. Allday testified that he began making changes to the name of his product in response to the Plaintiff's threats. He related that during a trade conference in December 2012, his employees reported that the Plaintiff's representatives were interfering with their ability to meet with prospective customers. It was necessary to have the administrator of the conference to instruct the Plaintiff's people to leave Mr. Allday's employees alone. In addition, an agent of the Plaintiff tried to interrupt Mr. Allday while he was teaching a class in order to deliver a "cease and desist" letter from the Plaintiff's attorney. Mr. Allday stated that he was so disturbed by a call from the Plaintiff's lawyer that he changed the name of his product from "Deep Water Oil Claim Calculator" to "BP Claim Calculator."

Mr. Allday explained that the round table meetings had begun at the time of Hurricane Katrina as a forum to discuss how to report hurricane losses, and had continued since that time. He related that during the July 2012 round table meeting, there was a "buzz" about the BP settlement, which offered opportunities for accounting work after tax season had ended. Some of the CPAs at the meeting said they had already created their calculators. It was then that Mr. Allday decided to create his own calculator.

Mr. Allday testified that the first time he saw any representative of the Plaintiff was at the October 2012 round table meeting. They were not CPAs, but had been afforded an opportunity to demonstrate their product. Mr. Allday related that he had arrived early to ensure that all of his equipment worked properly. The Plaintiff's people were scheduled to begin at 8:30 a.m., but did not arrive until nearly 9:00 a.m. Once there, they could not get their computers hooked up, and Mr. Allday loaned them his adaptor. As a result of the late start, Mr. Allday could not begin his presentation until after 10:00 a.m., when the meeting was scheduled to conclude at 10:30 a.m. Mr. Allday stated that it was his intent to have Mr. Dominique answer any questions posed by the group, but the Plaintiff's people took over before Mr. Dominique could respond to any questions. After the Plaintiffs' representatives told Mr. Allday that he should not sell calculators and that those who had tried were no longer in business, they exchanged business cards and discussed the possibility of working together. However, no one representing the Plaintiff ever called Mr. Allday.

Mr. Allday explained that he went to the Louisiana trademark office to register his product names because he saw that the Plaintiff was using the trademark symbol without having a registered trademark. He noted that the Plaintiff was still using the symbol in ads which ran in June 2013. Mr. Allday also testified that he has owned the domain name BPClaimsCPA.com since

August 2012. In April 2013, there was an anonymous registration of the domain name BPClaimCPA.com. Mr. Allday stated that when he visited this website, he was redirected to the Plaintiff's site.

Mr. Allday testified that the Plaintiffs' communications with the Louisiana Society of CPAs has caused him acute embarrassment, and damage to his reputation and business. He stated that he has told the Society members to await the outcome of this lawsuit, but he believes that the rebuilding of his image will be a daunting task.

Finally, Mr. Allday stated that he began working on BP claims for his clients in June 2010. He directed Mr. Dominique to begin work on the calculator project in July 2012. Mr. Allday noted that the settlement formulas had been generated by the BP claims administrators and were available to the public.

The Defendants re-called David Dominique as their witness. Mr. Dominique testified that it took him three days to go through the BP settlement agreement, and that all of his ideas for the Excel-based calculator he created came from that agreement. Mr. Dominique stated that he did not copy anything from the Plaintiff's calculator. He explained that the Plaintiff's software did not provide the user with the option of excluding the two lowest months from the damage calculation, and he believed this omission led to inaccurate results. Mr. Dominique identified other differences between the two programs: the Plaintiff's program could identify the zone of the user and could determine RTP, which the Defendants' program could not; the Plaintiff's program utilized separate web pages, while the Defendants' program had all data on a single spreadsheet, and the Plaintiff's program required the user to enter data for one year at a time, as

opposed to five years on the Defendant's program.

Each of the parties introduced into evidence a number of documents: Plaintiff's Exhibits 1–44 and Defendants' Exhibits 1–24.

## III. *DISCUSSION*

The district court may grant preliminary injunctive relief if the movant shows "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party, and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998). The court "need not find that the evidence positively guarantees a final verdict in the plaintiff's favor, and "may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction." *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.,* 51 F.3d 982, 985 (11th Cir.1995)

### A. *Irreparable Injury*

The primary question to be resolved in determining whether irreparable injury will occur if an injunction is not issued is whether an award of damages is a sufficient remedy for the alleged wrongs. In actions brought for infringement under the Lanham Act, damages consist of "(1) the defendant's profits, (2) any damages sustained by the plaintiff and (3) the cost of the action," and include all elements of injury to the plaintiff's business, such as the costs of corrective advertising or injury to business reputation or good will. *Aronowitz v. Health–Chem Corp.,* 513 F.3d 1229, 1241 (11th Cir.2008) (citing *Ramada*

**1280**

*Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1564–65 (11th Cir.1986)).

During oral argument on the instant motion, the undersigned inquired of counsel for the Plaintiff why an award of damages would not sufficiently compensate the Plaintiff for the injuries it alleges. Counsel could only cite the possibility that potential customers would visit the Defendants' website, find the product to be undesirable and decide not to buy any calculator, when otherwise the Plaintiff's calculator might have been purchased. The undersigned finds that this possibility is too speculative and remote to support a finding that irreparable injury will result if a preliminary injunction is not issued.

However, counsel for the Plaintiff also relies on the language of the online user agreement, which states, in pertinent part:

> 13.6. Remedies. The parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that the [sic] any party may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement.

(Plaintiff's Exhibit 35 at 7) Thus, this Court must determine whether the Defendants were bound by the user agreement.

It is axiomatic that a binding and enforceable contract requires "mutual assent to certain and definite contractual terms; without a meeting of the minds on all of the essential terms, no enforceable contract arises." *Matter of T & B General Contracting, Inc.*, 833 F.2d 1455, 1459 (11th Cir.1987). The formation of contracts over the internet "has not fundamentally changed the principles of con-

tract." *Register.com v. Verio, Inc.*, 356 F.3d 393, 403 (2nd Cir.2004). The two types of internet contracts are succinctly defined in *Hines v. Overstock.com*, 668 F.Supp.2d 362, 366 (E.D.N.Y.2009):

> On the internet, the primary means of forming a contract are the so called "clickwrap" (or "click-through") agreements, in which website users typically click an "I agree" box after being presented with a list of terms and conditions of use, and the "browsewrap" agreements, were website terms and conditions of use are posted on the website typically as a hyperlink at the bottom of the screen.

It is undisputed that the type of agreement alleged by the Plaintiff in this case is a browsewrap. "In ruling upon the validity of a browsewrap agreement, courts consider primarily 'whether a website user has actual or constructive knowledge of a site's terms and conditions prior to using the site.'" *Id.* (quoting *Southwest Airlines Co. v. BoardFirst, L.L.C.*, 2007 WL 4823761 at *4 (N.D.Tex. Sept. 12, 2007)). The Second Circuit held that "a consumer's clicking on a download button does not communicate assent to contractual terms if the offer did not make clear that clicking on the download button would signify assent to those terms." *Specht v. Netscape Communications Corporation*, 306 F.3d 17, 29–30 (2nd Cir.2002). Thus, "where consumers are urged to download free software at the immediate click of a button, a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms." *Id.* at 32.

For the reasons set forth below, the undersigned finds that the Plaintiff has not proven that the Defendants were bound by the terms of the online user agreement

because the Plaintiff failed to demonstrate: (1) the agreement existed on its website in August 2013; (2) the agreement applied to the free demonstration of the product, or (3) the Defendants agreed to its terms.

### 1. *Existence at the Time of the Defendants' Application*

Mr. Jacobs, Vice President of the Plaintiff and creator of the Plaintiff's calculator, testified that access to the user agreement is accomplished by scrolling to the bottom of each page of the Plaintiff's website (www.oilclaimcalculator.com) to the word "terms" in small type. This word is a "hyperlink," so that clicking on the word would direct the website visitor to another screen containing the agreement. According to Mr. Jacobs, the hyperlink existed on the website at the time Ms. Tran submitted an application for a free demonstration of the product. Mr. Jacobs noted that Ms. Tran was required to access three pages of the website in order to submit the application, and that the "terms" hyperlink was at the bottom of each of those pages. However, there was no requirement that she accept the terms by clicking a box or taking any other affirmative step.

Ms. Tran testified that she did not notice any hyperlink labeled "terms" anywhere on the Defendants' website at the time she applied for a free trial. She further testified that internet research she conducted revealed that the user agreement was dated October 2012 and posted online on October 14, 2012. (Defendants' Exhibits 4, 22) Counsel for the Defendants noted in his argument that in the Defendants' Response in Opposition to Plaintiff's Motion for Leave to File Second Amended Complaint, they pointed out that "a screen shot of the Online User Agreement evidences that it is dated 10/2012, which is one month *after* ITSG alleges that Allday accessed ITSG's product." (DE 23 at 6)

Attached to the Defendants' response is a copy of the screen shot, which displays the title, "ITSG User Agreement and Terms 10–2012.pdf." (DE 23A)

The Defendants' response was filed on April 15, 2013, and on April 19, 2013, Mr. Jacobs sent the following email to Mike Haynes, one of the Plaintiffs' employees:

The problem is the file name that is displaying at the top.

We do not want it saying 10–12.

It should use the filename I sent you that says "ITSG Online User Agreement and Terms.pdf" nothing else.

(Defendant's Exhibit 5)

Mr. Haynes responded:

I had only updated it on ITSG. Didn't Realize I was supposed to update it on OCC too. Done. http://www.oilclaim calculator.com/terms.

*Id.*

The Plaintiff's explanation for the inclusion of "10–2012" in the title of the website screen containing the user agreement, which was displayed on that screen until the Defendants' response was filed in April 2013, was that it was a typographical error made by a web master. The undersigned finds that an equally reasonable inference is that the agreement was created in October 2012. Since this was subsequent to the Defendants' free trial, the Plaintiff has failed to demonstrate that it was possible for the Defendants to agree to the terms set forth in the agreement.

### 2. *Application to the Demonstration*

Assuming *arguendo* that the there was a "terms" hyperlink to the user agreement on the Plaintiff's website at the time the Defendants applied for a free trial, a review of the agreement suggests that it applies to customers who have purchased the right to use the Plaintiff's software, rather than those who merely have signed

up for a free trial. The agreement refers to the payment of consideration in the amount of $10.00, user fees, additional payment terms and taxes, none of which applied to the free trial/demonstration requested by the Defendants. (Plaintiff's Exhibit 35, pp. 1–3) Therefore, even if the Defendants had clicked on a hyperlink to the agreement, it would have been reasonable for them to believe that the agreement only applied once a decision was made to purchase the Plaintiff's product. The Plaintiff failed to show that the online user agreement was applicable to those who obtained a free trial, but elected not to purchase the product.

### 3. *Mutual Assent*

Finally, even if there was a "terms" hyperlink on the website which directed the Defendants to the user agreement, and the agreement is deemed to apply to a free trial, the Plaintiff has not offered any evidence. that the Defendants agreed to its terms. Ms. Tran testified that before accessing the form she used to request a free trial of the Plaintiff's product, she first had to click on the website home page and a second page. She did not notice or click on a "terms" hyperlink at the bottom of the web pages. When speaking to Mr. Leidolf, Ms. Tran did not ask anything about the user terms because she only was interested in seeing the product. During the demonstration, Ms. Tran asked no questions, but Mr. Allday and Mr. Dominique did ask questions.

Mr. Dominique testified that he participated in the free trial, which did not require him to go to the Plaintiff's website. He clicked on the link provided by the Plaintiff and utilized the user name and password that had been provided by the Plaintiff. Mr. Dominique logged in no more than two or three times and did not read the text of the security warning.

The security warning begins by stating that access is for authorized users only, and further states:

> You agree to comply with all confidentiality and security requirements that OCC may impose for use of their implementation of the Oil Claim Calculator, and you agree not to circumvent such security requirements. By clicking "Log In" you are agreeing to these terms.

The Plaintiff argues that this language binds the customer to the terms of the online user agreement, relying on *Fteja v. Facebook, Inc.,* 841 F.Supp.2d 829 (S.D.N.Y.2012). However, that case did not involve a true browsewrap license, in which the website contains a notice that by using the services of, obtaining information from, or initiating applications within the website, the user is agreeing to and is bound by the site's terms of service. Instead, the Facebook sign-up page required a manifestation of assent:

> A putative user is ... asked to click a button that reads "Sign Up." After clicking this initial "Sign Up" button, the user proceeds to a page entitled "Security Check" that requires a user to reenter a series of letters and numbers displayed on the page. Below the box where the putative user enters that letter-number combination, the page displays a second "Sign Up" button similar to the button the putative user clicked on the initial page. The following sentence appears immediately below that button: "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service." The phrase "Terms of Service" is underlined, an indication that the phrase is a hyperlink. ...

*Id.* at 834–35. The court noted that this process did not result in a pure-form clickwrap agreement because it did not contain

any mechanism that forced the user to actually examine the terms of use before assenting, but held that "it is not too much to expect that an internet user whose social networking was so prolific that losing Facebook access allegedly caused him mental anguish would understand that the hyperlinked phrase "Terms of Use" is really a sign that says "Click Here for Terms of Use." *Id.* at 839.

By contrast, the security warning in the instant case simply informed the user that he or she agreed to any confidentiality and security requirements that the Plaintiff might impose for use of their product. The warning contained no hyperlink to the online user agreement, and did not otherwise alert the user to the existence or location of any confidentiality or security requirements other than those set forth in the security warning. Since, as Mr. Dominique testified, the link for the free trial did not direct him to the Plaintiff's website, with its "Terms" hyperlink at the bottom of the page, there was no way for him to know that any additional terms of use existed.

In *Cvent, Inc. v. Eventbrite, Inc.*, 739 F.Supp.2d 927 (E.D.Va.2010), the plaintiff relied exclusively on its "terms of use," which were explained on secondary pages of its website and could be accessed only through one of several dozen small links buried at the bottom of the website's first page. Users of the website were not required to click on that link, nor were they required to read or assent to the terms of use in order to use the website or access any of its content. The court held that under these circumstances, the plaintiff had failed to state a plausible claim that the website user would have had actual or constructive knowledge of the site's terms and conditions and manifested assent to them. *Id.* at 937–38.

█ Based on the reasoning of *Specht* and *Cvent*, the undersigned finds that the Plaintiff has failed to demonstrate that the Defendants had actual or constructive knowledge of its online user agreement and that they assented to the terms of that agreement. Therefore, the Defendants did not agree to paragraph 13.6 of the agreement, which provides that money damages for breach of the agreement are not sufficient and either party may sue for injunctive relief in the event of a breach.

As noted earlier, the Lanham Act provides for an award of damages, and the Plaintiff has failed to provide any genuine reason why damages would be insufficient, particularly since its product will not be viable once the April 2014 deadline for filing claims has passed. Therefore, the Plaintiff has not met its burden of proving that irreparable injury will be suffered unless the injunction issues, and the instant motion should be denied on this basis.

**B. Remaining Elements for Issuance of a Preliminary Injunction**

Since the Plaintiff has not shown irreparable injury, the undersigned will offer only a brief analysis of the other elements which must be proved before the issuance of an injunction is warranted: likelihood of success on the merits, threatened injury to the Plaintiff outweighs the damage to the Defendants and injunction not adverse to the public interest.

**1. Likelihood of Success on the Merits**

█ The Plaintiff has moved for a preliminary injunction based solely on its claims for breach of contract and trade dress violation. For the reasons discussed in the preceding section, the Plaintiff is not likely to prevail on its breach of contract claim. The undersigned believes that the likelihood of success of the Plaintiff's trade dress claim is similarly slim.

The law pertaining to claim of trade dress infringement was summarized by the Court in *Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197 (11th Cir.2004):

> Section 43 (a) [of the Lanham Act] creates a federal cause of action for trade dress infringement. "The term 'trade dress' refers to the appearance of a product when that appearance is used to identify the producer." " 'Trade [d]ress' involves the total image of a product a may include features such as size, shape, color . . ., texture, graphics, or even particular sales techniques." In order to prevail on this claim for trade dress infringement under § 43(a), [the plaintiff] must prove that (1) the product design of the two products is confusingly similar; (2) the features of the product design are primarily non-functional; and (3) the product design is inherently distinctive or has acquired secondary meaning.

*Id.* at 1202. (Citations omitted.)

"Although the text of Section 43(a) does not "explicitly require[ ] a producer to show that its trade dress is distinctive, . . . courts have universally imposed that requirement, since without distinctiveness the trade dress would not 'cause confusion . . . as to the origin, sponsorship, or approval of [the] goods.' " *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1322 (11th Cir.2012) (quoting *Wal–Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 210, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000)).

A visual comparison of the Plaintiff's trade dress (Plaintiff's Exhibit 22) and that of the Defendant (Plaintiff's Exhibit 23) makes clear that they are not confusingly similar. Additionally, the Plaintiff's primary complaint involves the use of a box in the Defendant's design to represent a software product. This design element must be deemed "functional," which is defined as a feature "likely to be shared by different producers of the same product and therefore . . . unlikely to identify a particular producer." *Publications International, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 340 (7th Cir.1998). Finally, the Plaintiff has not established that its product design, which originated only last year, is inherently distinctive or has acquired a secondary meaning.

Accordingly, the Plaintiff has not demonstrated a likelihood of success on the merits of either of the two claims asserted in the instant motion.

### 2. *Comparative Injury to the Parties*

The Plaintiff asserts that the oil claim calculator is its sole source of revenue, while sales of its calculator comprises only 10% of the Defendants' business. However, Mr. Sienema, the Plaintiff's Vice President, admitted that he reported Mr. Allday to the Louisiana Society of CPAs, and had sent a copy of the Plaintiff's complaint to that organization. Thus, the damage to the Defendants' business and reputation extends beyond the loss of sales revenue. The issuance of a preliminary injunction, which the Plaintiff presumably would forward to the CPA Society, could cause immense damage to the Defendants' accounting business. Therefore, the undersigned finds that the threatened injury to the Plaintiff does not outweigh the damage to the Defendants if an injunction were to issue.

### 3. *Adversity to the Public Interest*

The Plaintiff asserts that the public has an interest in upholding the rights of intellectual property owners. However, intellectual property law also "respects the policy of free copying and the free economic

competition such copying encourages." *Miller's Ale House*, 702 F.3d at 1315. And federal courts have recognized that "there exists a fundamental right to compete through imitation of a competitor's product, which right can only be temporarily denied by the patent or copyright laws." *Dippin' Dots*, 369 F.3d at 1203 (quoting *In re Morton–Norwich Products, Inc.*, 671 F.2d 1332, 1336 (CCPA 1982)).

█ In light of the weakness of the Plaintiff's two asserted claims, together with the public policy of promoting free competition, the undersigned finds that the issuance of a preliminary injunction in this case would be adverse to the public interest. Therefore, the Plaintiff has failed to satisfy any of the four elements required for the issuance of a preliminary injunction, and the instant motion should be denied.

### *CONCLUSION*

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the Plaintiff's Motion for Entry of Preliminary Injunctive Relief Against Defendants (DE 26) be DENIED.

The parties will have 14 days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with The Honorable Robert N. Scola, Jr., United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745 (11th Cir.1988), *cert. denied*, 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir.1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 9th day of September, 2013.